Brian S. King, #4610
Samuel M. Hall, #16066
Michelle B. White, #16985
Andrew D. Miller, #19625
Haley K. Kendall, #20634
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
samuel@briansking.com
andy@briansking.com
haley@briansking.com
mwhite@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SCARLET L., individually and on behalf of P.L. a minor,<br><br>Plaintiff,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC d/b/a ANTHEM BLUE CROSS and BLUE SHIELD and BANK OF AMERICA GROUP BENEFITS PROGRAM,<br><br>Defendants. | COMPLAINT<br><br>Civil Case No. 2:26-cv-01157 |

Plaintiff Scarlet L. ("Scarlet") individually and on behalf of P.L. a minor, through her undersigned counsel, complains and alleges against Defendants Blue Cross Blue Shield Healthcare Plan of Georgia Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and the Bank of America Group Benefits Program ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Scarlet and P.L. are natural persons residing in Dallas County, Texas. Scarlet is P.L.'s mother.
2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the insurance plan providing coverage for the Plaintiff ("the Plan") during the treatment at issue in this case.
3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Scarlet was a participant in the Plan and P.L. was a beneficiary of the Plan at all relevant times. Scarlet and P.L. continue to be participants and beneficiaries of the Plan.
4. Plan participants and beneficiaries were told that Anthem was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.
5. At all relevant times, Anthem acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.
6. P.L. received medical care and treatment at Blue Ridge Therapeutic Wilderness ("Blue Ridge") from August 30, 2024, to November 13, 2024, Gateway Academy ("Gateway") from November 14, 2024, to March 16, 2025, Vivid Safe House ("Vivid") from March 17, 2025, to March 24, 2025, and Second Nature Wilderness Therapy ("Second Nature") from March 25, 2025, through June 5, 2025.

7. These are treatment facilities which provide sub-acute inpatient treatment and/or crisis stabilization services to adolescents with mental health, behavioral, and/or substance abuse problems. Blue Ridge is located in Georgia, while the others are in Utah.
8. Anthem denied claims for payment of P.L.'s medical expenses in connection with his treatment at Blue Ridge, Second Nature, and Gateway. Anthem authorized payment for the initial treatment at Gateway as well as the treatment at Vivid, albeit at a significantly lower rate than called for under the terms of the Plan.
9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.
10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah through its network of affiliates, and the treatment at issue took place in Utah.
11. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both her and P.L.'s privacy will be preserved.
12. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### P.L.'s Developmental History and Medical Background

13. From a young age, P.L. was often disruptive and sensitive to loud noises and external stimuli. As early as eight years old he started saying that life wasn't worth living. He had a wellness check from school resource officers when he was nine after he emailed a member of the school administration saying that he wanted to die.

14. P.L. was given a neuropsychological evaluation in November of 2021 and was diagnosed with ADHD. Shortly afterwards in March of 2022, P.L. told his pediatrician that he was experiencing suicidal ideation with a plan. P.L.'s medications were adjusted, and while he still experienced suicidal ideation, he claimed the intensity had decreased.

15. P.L. continued to be disruptive at school. On one occasion he ran away after being sent to the vice principal's office. Then two days later, he dropped his pants at school, was again sent to the vice principal's office where he then claimed to be feeling suicidal. P.L. was taken to the emergency room and then received outpatient and partial hospitalization care once he had stabilized.

16. P.L. continued to experience suicidal ideation and was again hospitalized between April 16, 2022, and April 22, 2022. Shortly after discharge, P.L. became suicidal again and was taken to a different hospital for nine days. His medications were adjusted and he continued in outpatient care.

17. P.L. briefly attended a summer camp but ran away from the program. He began seeing a new psychiatrist and started attending a new outpatient program.

18. On December 21, 2022, P.L. attempted suicide by overdose and was again hospitalized before receiving additional outpatient care. After returning home, P.L. ran away for a time.

19. P.L. continued to present as withdrawn and was often bullied. He would often skip classes and struggled in school. On one occasion, P.L. was shoved into a locker unprovoked which broke his laptop screen. When P.L. realized this, he retaliated by punching the aggressor. P.L. received detention and school discipline for this incident.

20. In May of 2024, P.L. again attempted suicide by overdose. He stated that he felt worthless and was very lonely, stating his belief that only his parents cared about him. He was again hospitalized and again received additional outpatient care.

21. While P.L. initially showed some signs of improvement at this point, it was not long before he again started plotting suicide. He lied to his mother about where he was going and procured a bottle of Advil. He initially intended to overdose on the pills until he researched the topic and determined the overdose would not likely be lethal but could lead to serious health conditions like paralysis.

22. P.L.'s school counselor became aware of the aborted suicide attempt and warned Scarlet that P.L. would not be safe at school. P.L. was then admitted to Blue Ridge where he was also diagnosed as being on the autism spectrum.

**Blue Ridge**

23. P.L. was admitted to Blue Ridge on August 30, 2024.

24. In a series of Explanation of Benefits statements, Anthem denied payment for P.L.'s treatment, stating that the services required preapproval.

25. On August 14, 2025, Scarlet submitted an appeal of the denial of payment for P.L.'s treatment at Blue Ridge.

26. Scarlet contended that Anthem had failed to abide by the plain terms of the insurance contract, as the penalty for failing to obtain preapproval was limited to a penalty not exceeding $500.

27. She asked Anthem to reprocess the claim. In addition Scarlet asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

28. In a letter dated March 9, 2026, Anthem upheld the denial of payment for P.L.'s treatment. The letter quoted the following language from the mental health and chemical dependency limitations section of the summary plan description:

> No payment will be made for expenses incurred for: Alternative residential programs, such as wilderness camps or military schools, unless they are licensed in their state as a residential treatment facility, provide 24-hour nursing care and have an onsite psychiatrist to provide weekly assessments. Refer to Covered medical services in this section for benefits covered under your medical plan.

29. In violation of ERISA's notice procedures, Anthem did not provide Scarlet with advance notice that it had changed its justification for the denial. As the Plan only allows for one internal appeal and Scarlet spent hers addressing Anthem's improperly applied

precertification claim, she was deprived of the opportunity to more fully dispute Anthem's new denial of payment using the internal appeals process.

**Gateway**

30. P.L. was admitted to Gateway on November 14, 2025.

31. Anthem approved the initial stages of P.L.'s treatment.

32. In a letter dated January 8, 2025, Anthem denied payment for P.L.'s treatment from January 7, 2025, forward under the basis that:

> The request tells us you went to a residential treatment center for a mental health condition. The program asked to extend your stay. The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self-care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep the condition from getting worse. There is 24 hour clinical support available as needed. We reviewed the information we were given. We talked to a therapist. The information we have does not show you are a danger to yourself or others, or that you are having serious problems functioning. Care can be given outside of RTC. Based on the guideline and what we know, the request is denied. The request is not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

33. Of note, many of Anthem's justifications for the denial appear to be equally true on January 6, 2025, when it approved care as they were on January 7, 2025, when it denied it. Anthem did not identify with any specificity what particular circumstances led it to identify January 7, 2025, as the last covered day, nor did it explain why its stated

justification for the denial appears from the outside to apply as equally to the days it approved as those it did not.

34. On June 30, 2025, Scarlet submitted a level one appeal of the denial of payment for S.L.'s treatment. Scarlet again outlined her expectations of a full, fair, and thorough review under ERISA. She asked Anthem to carefully consider all the information she had provided and reminded Anthem that it had an obligation to act in her best interest.

35. She argued that Anthem's denial was conclusory and that it stated that S.L.'s treatment was not medically necessary without supporting this claim with any clinical evidence. She wrote that "vague and unhelpful statement[s]" like "[w]e talked to a therapist" were inadequate. She asked Anthem to specifically address the arguments and evidence she provided and asked to be given any documentation related to the decision to deny payment, including any case notes or reports.

36. She wrote that Anthem had not furnished her with a copy of the MCG criteria on which it purported to rely, but her own review of the criteria left her unable to determine which, if any, of the requirements were unmet. She asked Anthem to support its next determination with specific references to any requirements it deemed met or unmet.

37. She contended that the MCG criteria were severely lacking compared to other criteria such as the CALOCUS-CASII which were often used by insurers. She cited to numerous court cases in which the MCG criteria had been found to be lacking or misapplied in a way that made it easier for the insurer to deny payment.

38. She noted that in prior iterations, the MCG criteria referred to themselves as residential acute behavioral health level of care criteria. MCG later dropped the word acute from the title in future versions while changing little else.

39. She argued that the MCG criteria were drafted to help insurance companies save money and with little regard for generally accepted standards of medical practice.

40. She contended that Anthem violated MHPAEA by imposing acute level requirements to qualify for non-acute residential treatment care. She wrote that Anthem did not require acute factors such as a risk of danger to self or others for individuals to qualify for analogous medical or surgical services.

41. She wrote that Anthem's actions had the effect of greatly limiting the availability of network residential treatment care. She noted that there were zero network residential providers in a 20-mile radius, while the same area had 37 network hospice and 104 network skilled nursing facilities.

42. She shared documentation from various sources including Milliman Inc. and Congressional investigations which showed the frequent prevalence of "ghost networks" and the difficulties insureds often faced when seeking network care, including residential treatment.

43. She directed Anthem to perform a MHPAEA compliance analysis to ensure it was administering the Plan in accordance with the statute and asked to be provided with a physical copy of any documentation used in the analysis.

44. Scarlet included copies of P.L.'s medical records with the appeal and argued that these showed that P.L.'s treatment was medically necessary. She also contended that P.L. did not yet meet the discharge requirements of the MCG criteria Anthem claimed to have used.

45. P.L.'s medical records showed ongoing concerning behaviors culminating in P.L. being discharged from Gateway prematurely on March 17, 2025, after physically striking a staff

member with a closed fist when P.L. was told he could not go to the recreation center without completing his chores.

46. Scarlet stated that if anything, P.L.'s premature discharge indicated that he needed a higher level of care, not a lower one as Anthem recommended. She contended that this incident directly refuted Anthem's justifications for denying payment. She again asked for a copy of the Plan Documents.

47. In a letter dated April 16, 2026, Anthem denied payment largely under the same rationales it had previously expressed. The letter stated in relevant part:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment center care. You were getting treatment for your mental health condition. We understand that you would like us to change our first decision. Now we have new information from the medical records (1175 pages). We believe our first decision is correct for the following reason: The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self-care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep the condition from getting worse. The information we have does not show that you were having thoughts to harm yourself or others. It shows that you were cooperating with your treatment and your mental health conditions have improved. You had support from your family. For this reason, we could not approve your request. There may have been other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

48. The letter did not meaningfully address any of the arguments Scarlet raised, including P.L.'s prolific suicidal ideation and overdose attempts prior to treatment, or the fact that

the reviewed dates ended when he was ejected from the program after a violent confrontation with staff.

49. On August 10, 2026, Scarlet asked for the denial of payment to be evaluated by an external review agency. Scarlet contended that Anthem had violated her rights under ERISA on numerous fronts.

50. First, she wrote that Anthem's response was not timely. She stated that it had 60 days from the appeal submission on July 5, 2025, to respond but Anthem issued no response until April 14, 2026.

51. She stated that she had inquired about the status after Anthem failed to respond, only to find out that Anthem had no record of the claims, forcing her to resubmit them.

52. She wrote that Anthem purported to have relied on the MCG criteria again to conduct the assessment, however, Anthem's denial did not appear to be based on the actual requirements of the MCG criteria, nor did it address P.L.'s specific issues. She questioned whether Anthem's unidentified reviewer had actually used the MCG criteria in their assessment at all.

53. She contended that Anthem had made no attempt to meaningfully respond to the arguments she raised –including her claim that the denial was a violation of MHPAEA– and that it failed to cite to a single piece of clinical evidence to support its assertions.

54. She wrote that as Anthem withheld the name and qualifications of its reviewer (other than a broad declaration that they were a medical director board certified in psychiatry), Scarlet was unable to verify whether they were appropriately qualified to evaluate the treatment in the first place.

55. Scarlet sent a separate copy of the letter to Anthem directly and asked it to address the allegations she had made regarding its failures to fulfil its ERISA obligations and abide by the terms of the Plan. She chided it for its "repeated oversights" and reminded it that it had a fiduciary duty to act in her best interest.

56. She also once again asked for documentation including the Plan Documents, making a bolded request in the letter to "**please send me all clinical judgments, documents, and materials used to determine the coverage for my son's claims."**

57. Scarlet asked the reviewer to carefully consider all the information she provided, and asked them to utilize the MCG criteria properly, explicitly directing them to ensure that they did not rely on acute level standards as Anthem had to evaluate P.L.'s subacute care.

58. Scarlet received no response to her requests from Anthem.

59. On September 29, 2026, external review agency MES Peer Review Services upheld the denial of payment for P.L.'s treatment. The reviewer wrote that although P.L. "has a history of multiple inpatient psychiatric hospitalizations and outpatient treatment" P.L.'s non-acute residential treatment was not medically necessary as it did not meet acute level requirements.

60. More particularly, the reviewer stated:[1]

> During the days under review, the patient participated in several forms of treatment, including group and individual therapy. There were occasions during therapeutic interventions when the patient expressed anger, frustration, and dissatisfaction toward the therapist. The patient had experienced multiple unsuccessful attempts at treatment at lower levels of care, along with escalating anxiety, executive functioning deficits, and related behavioral concerns. **Although some of the patient's acute symptoms had improved,** the patient continued to experience functional impairment, interpersonal conflict, difficulty with accountability, and other ongoing mental and behavioral health symptoms.

[1] Emphasis added.

> **The documentation indicated that longer-term, more intensive treatment than outpatient care was needed to address these chronic concerns safely and effectively.** No suicidal ideation was reported during the period under review. The patient remained able to complete routine activities of daily living.
>
> Although the patient has a documented history of psychiatric hospitalizations, anxiety, autism spectrum disorder, emotional dysregulation, social difficulties, and prior treatment at lower levels of care, the clinical records for the period under review **do not demonstrate the presence of acute psychiatric symptoms or safety concerns** requiring 24-hour residential treatment center (RTC) level of care. Specifically, there was no documentation of **active suicidal ideation, homicidal ideation, psychosis, severe self-injurious behavior, or other acute psychiatric instability** that would necessitate continuous residential monitoring and intervention. During the dates under review, the patient remained capable of participating in treatment, engaging in individual and group therapy, and completing routine activities of daily living. While ongoing concerns related to anger, interpersonal conflict, executive functioning deficits, communication challenges, social difficulties, and behavioral dysregulation were documented, these symptoms are reflective of chronic therapeutic needs **rather than an acute condition requiring residential containment**, crisis stabilization, or around-the-clock supervision.
>
> Current literature supports residential treatment as a component of the behavioral health continuum for individuals with severe psychiatric impairment whose needs cannot be safely managed in a less restrictive setting. However, treatment intensity should be matched to the patient's clinical acuity and functional needs. Becker et al. (2024) emphasize the importance of utilizing the least restrictive effective level of care and coordinating ongoing behavioral health services across treatment settings. Similarly, Merahn (2026) notes that residential treatment should be reserved for patients whose psychiatric or behavioral symptoms require a level of structure, supervision, and intervention that cannot be effectively provided through outpatient or community-based services.
>
> Therefore, based on the submitted records, current medical literature, and standard of care, the requested residential treatment center level of care, rendered at Gateway Academy, for dates of service 01/07/2025 thru 03/16/2025 was not supported as medically necessary in this case.

61. Residential treatment is a sub-acute intervention in most circumstances. As such, it is unclear why the unidentified external reviewer directly and explicitly made the outcome of their decision based on acute level factors.

62. In fact, the reviewer plainly stated that "more intensive treatment than outpatient care was needed" but did not indicate what treatment P.L. should have received, given that residential care is the typical recommendation when acute inpatient hospitalization is not needed, but outpatient care is not sufficient.

**Vivid**

63. P.L. was admitted to Vivid on March 17. 2025, after being kicked out of treatment at Gateway.

64. In a letter dated April 2, 2025, Anthem wrote that it had approved a network exception and P.L.'s treatment at Vivid from March 17, 2025, through March 26, 2025, would be approved as a covered network benefit.

65. On October 9, 2025, Scarlet submitted an appeal letter stating that Anthem had calculated its payments incorrectly and had only covered 15% of the billed charges.

66. She wrote that this was not consistent with Anthem's payment obligations for a network service and contended that Anthem should have paid 80% of the billed charges.

67. She directed Anthem to correct this error and to pay for the claims in accordance with the terms of the Plan.

68. Anthem has yet to correct the payment disparity.

**Second Nature**

69. P.L. was admitted to Second Nature on March 25, 2025,

70. In a letter dated March 25, 2025, Anthem stated that P.L.'s treatment at Second Nature had been denied on the same basis that the Blue Ridge claims were denied – an exclusion for "alternative residential programs" such as wilderness camps or military schools.

71. On September 16, 2025, Scarlet submitted an appeal of the denial of payment for P.L.'s treatment. Scarlet wrote that she was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information she provided, and which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

72. She alleged that coverage was available for treatment at Second Nature under the plain terms of the Plan. She quoted from the Mental Health and Chemical Dependency section of this booklet which stated that coverage was available for:

> Mental health and chemical dependency includes treatment rendered in connection with conditions classified in the Diagnostic and Statistical Manual of Mental Disorders (Fifth Edition) published by the American Psychiatric Association. (This is the diagnostic classification used by mental health and chemical dependency providers in the U.S.) Services include, but aren't limited to:
>
> - Acute inpatient and partial hospitalization
> - Outpatient office visits
> - Intensive outpatient programs
> - Residential treatment
> - Methadone clinics or other medication-assisted treatment programs.

73. She noted that this provision clearly stated that services included, but were not limited to, the enumerated providers.

74. She stated that Anthem was relying on an exclusion for alternative residential programs but that Second Nature was not, and had never purported to be, an alternative residential program.

75. She wrote that Second Nature was a licensed and accredited treatment program which employed a highly qualified treatment team and was compliant with all governing state regulations.

76. She contended that Anthem had failed to adequately define the term "wilderness camp" and was misconstruing it to include programs like Second Nature.

77. She wrote that Anthem's wilderness program exclusion did not apply to the treatment P.L. received at Second Nature.

78. She cited to a court case, in which another Anthem entity similarly failed to define the term wilderness camp for treatment at a similar facility called Aspiro. That court found the term ambiguous and stated that it could be "just as easily be applied to exclude a children's summer camp as it could be applied to exclude a 'Wilderness Adventure Therapy' program such as Aspiro."

79. The ruling then stated that the term was ambiguous as "the term has multiple, equally valid definitions." The court then ruled that the Anthem entity's conduct of excluding coverage at Aspiro was arbitrary and capricious.

80. Scarlet wrote that P.L.'s treatment at Second Nature was medically necessary and consistent with generally accepted standards of medical practice. She included peer reviewed articles and other documentation to this effect.

81. Scarlet also expressed concern that the denial of payment for P.L.'s treatment was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification.

82. Scarlet identified skilled nursing services, subacute rehabilitation services, inpatient habilitative services, and inpatient hospice services as some of the medical or surgical analogues to the treatment P.L. received.

83. She wrote that Anthem's categorical exclusion of "wilderness camps" under the alternative residential program umbrella was an impermissible non-quantitative treatment limitation based on facility type or provider specialty.

84. She also again contended that Anthem failed to maintain an adequate network of providers, which similarly suggested it was not acting in accordance with MHPAEA. She directed it to assess whether it was administering the Plan in accordance with the statute and asked to be provided with physical copies of the results of this assessment.

85. She again asked for a copy of the Plan Documents.

86. In a letter dated November 21, 2025, Anthem again denied payment for P.L.'s treatment, citing the same plan provision as it had in its March 25, 2025, letter and without meaningfully addressing any of the arguments Scarlet raised or producing the documents she had asked for.

87. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

88. The denial of benefits for P.L.'s treatment was a breach of contract and caused Scarlet to incur medical expenses that should have been paid by the Plan in an amount totaling over $245,000.

89. Anthem failed to produce a copy of the Plan Documents or other documentation including any medical necessity criteria for mental health and substance use disorder

treatment and for skilled nursing or rehabilitation facilities despite Scarlet's repeated requests.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Against Anthem and the Plan)**

90. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

91. Anthem and the Plan failed to provide coverage for P.L.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

92. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

93. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled. Anthem failed to substantively respond to the issues presented in Scarlet's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

94. In fact, Anthem's denial letters rely on formulaic recitations and do not address the arguments raised by Scarlet in any meaningful capacity.

95. Scarlet identified numerous ways in which Anthem failed to abide by its contractual obligations including its failure to issue payment in accordance with the appropriate plan provisions, its failure to process appeals within the allotted timeframe, its failure to define the term wilderness camp, or its failure to abide by the Plan's preauthorization provisions.

96. In the case of Blue Ridge, Anthem also failed to provide advance notice that it had changed its denial rationale, wholly depriving Scarlet of the ability to respond to its reasoning at all in the internal appeal process.

97. Anthem and the agents of the Plan breached their fiduciary duties to P.L. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in P.L.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of P.L.'s claims.

98. The actions of Anthem and the Plan in failing to provide coverage for P.L.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

99. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiff states in her first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiff contend she is entitled to relief and appropriate remedies under each cause of action.

//

//

//

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)
Against Anthem and the Plan)**

100. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

101. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

102. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

103. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

104. The application of the medical necessity and other criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent

or restrictive than the application of the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

105. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for P.L.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

106. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

107. Anthem and the Plan evaluated P.L.'s mental health claims employing medical necessity and other criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

108. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that P.L. received.

109. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as "[t]he plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care)."

110. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that P.L. received.

111. The Plan does not require individuals receiving treatment at subacute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

112. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

113. The improper use of acute level criteria was not limited to Anthem's own reviewer but was also employed by the external reviewer Anthem selected.

114. In that instance, the external reviewer appeared to believe treatment was necessary but not at the acute level, seemingly unaware that the portion of P.L.'s treatment they were asked to evaluate was not at an acute level of care.

115. In addition, the level of care applied by Anthem failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

116. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

117. Additionally, for residential treatment facilities providing mental health and substance use disorders, Anthem and the Plan fail to provide a comparable degree of network residential treatment facilities compared to the degree of network skilled nursing and inpatient rehabilitation facilities.

118. Anthem's categorical exclusion of wilderness camps under the alternative residential umbrella is a limitation based on facility type or provider specialty in violation of MHPAEA. Anthem also fails to properly define the language in its exclusion.

119. The failure by Anthem and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in a coverage disparity that violates MHPAEA.

120. The failure by Anthem and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in P.L. having to obtain treatment from non-network providers.

121. Being forced to go out of network for P.L.'s medically necessary services created a coverage disparity that violates MHPAEA because medical treatment provided by out of network providers are subject to more stringent coverage requirements and conditions than treatment provided by network providers.

122. In addition, being required to obtain treatment from out of network providers subjected Scarlet to higher cost-sharing obligations and lower benefits under the Plan than if the Plan had an adequate network of mental health providers from whom P.L.

could have received treatment. This also violates MHPAEA and may be the explanation for why the reimbursement rates at Vivid were so low.

123. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

124. Anthem and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Anthem and the Plan were not in compliance with MHPAEA.

125. In fact, despite Scarlet's request that Anthem and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Anthem and the Plan have not provided Scarlet with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Anthem and the Plan have not provided Scarlet with any information about the results of this analysis.

126. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity and other criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants due to their violations of MHPAEA;

(e) An order requiring an accounting of the funds wrongly withheld, by each Defendant, from participants and beneficiaries of the Plan because of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for her loss arising out of the Defendants' violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

127. The remedies the Plaintiff seeks under MHPAEA are not available under ERISA even if she is successful in obtaining remedies for wrongful denial of the Plan benefits.

128. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' improper use of criteria for medical necessity are not available as remedies for a wrongful denial of plan benefits.

129. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a sub-acute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

130. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C.§(a)(1)(B).

131. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for P.L.'s medically necessary treatment at Blue Ridge, Second Nature, Gateway, and Vivid under the terms of the Plan, plus pre and post-judgment interest to the date of payment;
2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

//

//

//

//

//

//

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 20th day of November, 2026.

By s/ Brian S. King
Brian S. King
Attorney for Plaintiff

County of Plaintiff's Residence:
Dallas County, Texas